UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 10-21982-CIV-ALTONAGA/Brown

**INTELSAT CORPORATION**; and
**INTELSAT, LLC**,

    Plaintiffs,

vs.

**MULTIVISION TV LLC**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court on Plaintiffs' Motion for Preliminary Injunction (the "Motion") [ECF No. 8], filed on June 16, 2010. The Court held a hearing on the Motion on August 4, 2010, at which Plaintiffs, Intelsat Corporation and Intelsat, LLC (collectively, "Intelsat"), and Defendants, World Wide Broadcast, Inc. ("World Wide") and Pablo Goldstein ("Goldstein"), were present. The Court has carefully considered the file, oral arguments, Goldstein's testimony, and the applicable law.

### I. BACKGROUND

This case involves the alleged theft of satellite bandwidth under the Federal Communications Act, 47 U.S.C. § 605, as well as state law claims of breach of contract, unjust enrichment, conversion, tortious interference with business relations, and conspiracy. The request for a preliminary injunction seeks to prohibit Defendants' alleged unlawful transmission and reception through an Intelsat satellite from a satellite uplink facility in Morocco.

Case No. 10-21982-CIV-ALTONAGA/Brown

On September 6, 2005, Defendant, Javier Eduardo Romero ("Romero"), managing member of Defendant, Multivision TV LLC ("Multivision TV"), signed, purportedly on behalf of Multivision TV, a Master Service Agreement ("Multivision MSA") with Intelsat in which Intelsat promised to provide telecommunication services to Multivision TV in exchange for charges and fees. (*See* Chernow Aff. ¶¶ 3, 6 [ECF No. 8-2]). At the time the agreement was executed, Multivision TV did not exist, having been administratively dissolved by the State of Florida nearly a year earlier. (*See id*. ¶ 4). Over the next several years, Multivision TV and Romero did not meet the payment obligations under the Multivision MSA, and so, on November 10, 2009, Intelsat terminated the Multivision MSA and all other service contracts with Multivision TV.[1] (*See id*. ¶¶ 6–7).

On November 16, 2009, four days after the Multivision MSA was terminated, World Wide entered into a Master Service Agreement ("World Wide MSA") [ECF No. 22-2] with Intelsat in which Intelsat promised to provide telecommunication services to World Wide according to separately executed service orders in exchange for charges and fees. (*See id*. ¶ 8). On December 9, 2009, Intelsat and World Wide executed a service order. (*See* Goldstein Decl. ¶¶ 14–16). According to World Wide, it entered the agreement with Intelsat to become a "new player" in the bandwidth resale business. (*Id.* ¶ 13). However, there appears to have been some confusion between Intelsat and World Wide about the type of business World Wide was planning to conduct.

During its negotiations with Intelsat, World Wide indicated its intention to "resell" the bandwidth it leased from Intelsat. (*See id*. ¶¶ 13, 17). Intelsat indicates the resale of bandwidth is

---

[1] It appears Romero may be the president of another Multivision corporate entity domiciled in Spain. (*See* Romero Service Aff. ¶ 8 [ECF No. 36-1]; Goldstein Decl. ¶ 8 [ECF No. 35]).

Case No. 10-21982-CIV-ALTONAGA/Brown

not uncommon when done in a certain manner.² (*See* Reply 9 n.6 [ECF No. 28]). Intelsat does have customers who own and operate satellite uplink facilities, lease satellite bandwidth from it, and then sublease bandwidth at their uplink facilities to programming providers. (*See id.*). Consistent with this business model and after World Wide signed the Service Order, Defendant, Carlos Velasquez ("Velasquez"),³ registered World Wide as the owner and operator of the satellite uplink site "Morocco 3." (*See* Johnson Aff. ¶¶ 3–4 [ECF No. 8-1]). Although not explicitly pleaded, Intelsat appears to have believed World Wide owned and operated Morocco 3, and that World Wide intended to sell satellite uplink services to customers who did not have transmission facilities. (*See* Reply 9; World Wide MSA ¶ 3.1). Evidently though, World Wide intended only to lease bandwidth from Intelsat for resale to a third party without providing additional services. (*See* Goldstein Decl. ¶¶ 13, 17). After the Service Order was signed by World Wide on December 9, 2009 and Morocco 3 was registered with Intelsat, the antenna began transmitting and receiving through transponder 72 on satellite IS-905. (*See* Johnson Aff. ¶¶ 5–7).

On February 9, 2010, Intelsat terminated the World Wide MSA and all World Wide service agreements because of non-payment. (*See id.* ¶ 6). Between February 10 and 11, 2010, Intelsat contacted World Wide's Florida office and Velasquez, the on-site technician at Morocco 3, to demand that the transmissions stop, but the transmissions from Morocco 3 did not cease. (*See id.*

---

² The World Wide MSA signed by Goldstein is attached to the First Amended Complaint and reads in part, "[s]ervice is provided to Customer for its own use or for Resale by Customer to a third party *as a part of a solution comprising other value-added telecommunications services*." (World Wide MSA ¶ 3.1) (emphasis added); *see also* Hr'g Tr. 19 (As the parties have not requested a transcript of the hearing, references are to the unofficial transcript.).

³ Defendant Velasquez is the on-site technician at the Morocco 3 satellite uplink site and represented himself to Intelsat as a technical employee of World Wide. (*See* Johnson Aff. ¶¶ 3–4, 9).

¶ 6–9). At the hearing, Goldstein, president of World Wide, stated that when he became aware Morocco 3 was transmitting, he contacted his customer to demand the transmissions stop. He testified, "[T]hey cut me [Goldstein] off, all conversations. They didn't respond to me. I tried text messaging. I tried emails, phone calls. I tried everything I could to get them to stop[,] and they just wouldn't stop. They just wouldn't even respond to me." (Hr'g Tr. 18).

Around March 4, 2010, Intelsat began transmitting an "incentive carrier" to the portion of the transponder previously allocated to World Wide in order to degrade or interrupt the signal from Morocco 3. Morocco 3 responded by increasing the strength of its own signal to overcome the effect of Intelsat's efforts to jam the transmission. (*See* Johnson Aff. ¶ 10–11). This increase in power output had the potential to cause interference for other users of the transponder. (*See id.*). The risk of interference led Intelsat to terminate the incentive carrier on March 9, 2010. Intelsat then contacted World Wide and Morocco 3 to ask them to reduce the power of the transmission, and the site complied within two hours. (*See id.* ¶ 12).

On March 25, 2010, after determining Morocco 3 was still transmitting and receiving through the transponder, Intelsat began to move its customers to other transponders. (*See id.* ¶¶ 14–15). Finally, on April 26, 2010, once its customers' transmissions were relocated, Intelsat muted the transponder by turning off the signal amplifier. (*See id.* ¶ 15). Later that day, Morocco 3 stopped transmitting. (*See id.* ¶ 16).

On June 16, 2010, Plaintiffs filed suit against Multivision TV, Romero, World Wide, Goldstein, and Velasquez seeking to recover damages and to enjoin Defendants from transmitting or receiving through Plaintiffs' satellites. (*See* Compl. [ECF No. 1]). Plaintiffs subsequently filed

Case No. 10-21982-CIV-ALTONAGA/Brown

a First Amended Complaint. (*See* Am. Compl. [ECF No. 22]). World Wide and Goldstein have appeared in the case to defend, but the remaining three Defendants have not yet appeared. Plaintiffs filed a Verified Return of Service (the "Multivision Service Aff.") [ECF No. 30-1] showing Plaintiffs served Multivision TV on June 17, 2010. Plaintiffs also filed an Affidavit of Service (the "Romero Service Aff.") stating Romero was properly served under Article 10(a) of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention") and Federal Rule of Civil Procedure 4(f)(2)(C)(ii). In the Romero Service Affidavit, Plaintiffs describe several unsuccessful attempts to serve Romero in Florida before twice attempting to serve him by Federal Express, signature required, at his office in Alicante, Spain. (*See* Romero Service Aff. ¶¶ 7–11). In both attempts to serve Romero by Federal Express, receptionists – and not Romero himself – signed for the packages. (*See id*. ¶¶ 10, 12). Plaintiffs have not yet served Velasquez. (*See* Hr'g Tr. 6).

Plaintiffs filed this Motion for Preliminary Injunction and seek to enjoin Defendants from unauthorized access to and interference with their satellites, transponders, equipment, and customers' transmissions.

## II.  LEGAL STANDARD

To prevail on a motion for preliminary injunction a plaintiff must show:

> (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest.

*N. Am. Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (quoting

5

Case No. 10-21982-CIV-ALTONAGA/Brown

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002)). Moreover, "[i]t is well established in this circuit that '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion' as to all four elements." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation marks omitted)).[4]

### III. ANALYSIS

Plaintiffs seek a preliminary injunction against each of the Defendants. Because the issues relating to World Wide and Goldstein are similar, these Defendants are addressed together. Romero, Multivision TV, and Velasquez are addressed individually below.

**A. Defendants World Wide and Goldstein**

An analysis of all four elements is not necessary with respect to World Wide and Goldstein because Plaintiffs have not shown a likelihood of irreparable injury should the Court not enjoin these Defendants. "A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (additional internal quotation marks and citations omitted)). The

---

[4] Plaintiffs contend they do not need to satisfy the four-part test to obtain an injunction because the Defendants violated 47 U.S.C. § 605(e)(3)(B)(i). (*See* Mot. 6–7). However, Plaintiffs are not "any person aggrieved" within the meaning of the statute; that is, they are not within the class protected by the statute. Section 605(d)(6) defines "any person aggrieved" as "any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming." Plaintiffs do not allege or provide any evidence of any proprietary interest in the communications or the contents of the communications that were transmitted and received by Morocco 3. Rather, Plaintiffs allege Defendants sent and received their own transmissions through Plaintiffs' satellites without authorization.

Case No. 10-21982-CIV-ALTONAGA/Brown

claimed irreparable injury "'must be neither remote nor speculative, but actual and imminent.'" *Id*. at 1176–77 (quoting *City of Jacksonville*, 896 F.2d at 1285 (additional internal quotation marks and citations omitted)); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant . . . . A presently existing actual threat must be shown.").

Plaintiffs claim that without an injunction, they will be forced to keep the satellite transponder muted or risk Morocco 3 will resume transmitting, which would cause financial losses and damage their reputation and goodwill. Assuming the damage to Plaintiffs' reputation and goodwill would be an irreparable injury, Plaintiffs still must show this harm is "actual and imminent." *Siegel*, 234 F.3d at 1176. At a minimum, this requires Plaintiffs demonstrate World Wide and Goldstein have the capability of transmitting to the Intelsat satellite; i.e., that these Defendants are able to do what Plaintiffs want enjoined.

Before the Court can determine if there is an actual and imminent risk that Morocco 3 will resume transmission if there is no injunction against Goldstein and World Wide, the Court must resolve a factual dispute over the ownership of the Morocco 3 uplink facility. Plaintiffs contend that Goldstein and World Wide have admitted World Wide owns and operates Morocco 3. Plaintiffs point to a few pieces of evidence to support this claim: (1) the antenna registration of Morocco 3 lists World Wide as the owner and operator of the facility; (2) Goldstein identified Velasquez, the Morocco 3 on-site technician, as an employee of World Wide and provided him with a World Wide email address; and (3) when Intelsat contacted Velasquez at Morocco 3 to demand the transmission be stopped, he refused to do so unless he was so instructed by the office in Florida. (*See* Reply 1–2

Case No. 10-21982-CIV-ALTONAGA/Brown

n.1).

In response, Goldstein, the president of World Wide, states his company "has limited its business to the sale and installation of broadcast equipment," and neither World Wide nor he "own[s] or operate[s] any transmission facility anywhere in the world." (Goldstein Decl. ¶¶ 6–7). Goldstein reiterated these assertions in his testimony at the evidentiary hearing. (*See* Hr'g Tr. 16–17). Goldstein also testified that when he contacted his customer to demand the Morocco 3 transmissions stop, he was cut off. According to Goldstein, "They didn't respond to me. I tried text messaging. I tried emails, phone calls. I tried everything I could to get them to stop[,] and they just wouldn't stop. They just wouldn't even respond to me." (Hr'g Tr. 18).

Despite the earlier statements and conduct of Goldstein, World Wide, and Velasquez suggesting World Wide owns and controls Morocco 3, the Court credits Goldstein's affidavit and his testimony at the hearing. Plaintiffs have not provided sufficient evidence to prove World Wide or Goldstein owns, operates, or has access to Morocco 3.

In the absence of this showing, the Plaintiffs' concern that Morocco 3 will resume transmitting unless an injunction is issued against World Wide and Goldstein is highly speculative. Because Plaintiffs have not established that World Wide and Goldstein control Morocco 3 or any other satellite uplink facility which can transmit to Plaintiffs' satellites, they have not shown that these Defendants have the means to engage in the conduct Plaintiffs seek to enjoin. Consequently, Plaintiffs have not demonstrated that their alleged irreparable injury is "actual and imminent." An actual and imminent injury is a prerequisite for the issuance of a temporary injunction; therefore, Plaintiffs' Motion is denied as to Goldstein and World Wide.

### B. Defendant Multivision TV[5]

Defendant Multivision TV has yet to appear in this case. Plaintiffs provided an affidavit asserting Multivision TV was properly served. (*See* Notice of Filing Aff. of Service [ECF No. 30]). While Local Rule 7.1(c) provides that a motion may be granted by default when a party does not file an opposition, and the undersigned indicated at the hearing her intention of enjoining the other Defendants who did not object to the Motion, a preliminary injunction may only be entered if the moving party satisfies its burden with respect to each of the four elements of the test. *See Siegel*, 234 F.3d 1176 (stating that a preliminary injunction is not to be granted unless the plaintiff meets its burden of persuasion); *Wisdom v. Centerville Fire Dist., Inc.*, No. CV07-95-S-EJL, 2008 WL 694693, at * 5 n.1 (D. Idaho Mar. 12, 2008) ("Plaintiff must still meet his burden to demonstrate that he is entitled to injunctive relief, even in the face of a failure by the opposing party to file a response brief."); *Stern v. Epps*, No. 2:08cv33-KS-MTP, 2008 WL 5120111, at * 1 (S.D. Miss. Dec. 4, 2008) (same).

As with World Wide and Goldstein, an analysis of all four elements is not necessary because Plaintiffs fail to meet their burden with respect to the second element. Plaintiffs do not demonstrate a substantial likelihood of an imminent, irreparable injury in the absence of an injunction against Multivision TV because they do not provide any evidence Multivision TV had any relationship with Morocco 3. In the Amended Complaint, Plaintiffs allege "[u]pon information and belief, World Wide intended to and did resell the satellite services it leased from Intelsat to Multivision." (Am.

---

[5] Although Multivision TV was administratively dissolved by the State of Florida in 2004, dissolution of a corporation does not "[p]revent commencement of a proceeding by or against the corporation in its corporate name." Fla. Stat. § 607.1405(2)(e).

Case No. 10-21982-CIV-ALTONAGA/Brown

Compl. ¶ 17). But this allegation is not supported in the Plaintiffs' affidavits. Indeed, the Johnson Affidavit, which focuses on the illicit transmissions to the Intelsat satellite, only implicates World Wide, Goldstein, and Velasquez in the misuse of Intelsat's satellite services; Multivision TV is not mentioned. (*See generally* Johnson Aff.). The Chernow Affidavit discusses Intelsat's relationship with Multivision TV, but the discussion is limited to facts related to the breach of contract claim against Multivision TV. (*See* Chernow Aff. ¶¶ 3–7). In his Declaration, Goldstein only mentions that "Multivision was understood to be a foreign corporation," (Goldstein Decl. ¶ 8); and at the hearing, Goldstein testified only that he sold equipment to a branch of Romero's company, Multivision, in Spain in 2007 and 2008. (*See* Hr'g Tr. 17). None of these statements link Multivision TV to the transmissions from Morocco 3.

Moreover, Multivision is not identified in the affidavits or testimony as World Wide's customer in its plan to become a bandwidth reseller. Interestingly, when discussing World Wide's bandwidth resale plans, Goldstein refers only to "the customer," and never mentions the customer's name. For example, in direct examination Goldstein was asked, "[w]hat did you do when you first found out that the satellite service had actually begun without your consent?" (Hr'g Tr. 18). To which he replied, "I did try to contact the customer . . . who had run tests on the satellite." (*Id.*) The same care is taken in World Wide's Response, which consistently refers only to World Wide's "customer" when discussing the transmissions from Morocco 3. (*See* Resp. 3, 5, 8, 12 [ECF No. 21]). Plaintiffs' counsel did not ask Goldstein to identify his resale customer at the hearing.

Given that Multivision TV was administratively dissolved in 2004, and that there is no evidence in the record linking it to the transmissions from Morocco 3, any irreparable injury

10

Case No. 10-21982-CIV-ALTONAGA/Brown

Plaintiffs may suffer in the absence of an injunction against Multivision TV is remote and speculative, not actual and imminent. Therefore, a preliminary injunction against Multivision TV is denied.

### C. Defendant Romero

Defendant Romero has yet to appear in this case. He did not file an opposition to the Motion or appear at the hearing on the Motion. There is a threshold issue of whether Romero has been effectively served under the Federal Rules of Civil Procedure. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); *see also Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1360 (11th Cir. 2008) ("Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served.") (quoting *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990)).

Plaintiffs have filed an Affidavit of Service stating Plaintiffs twice served process on Romero at his place of work in Spain by Federal Express packages requiring a signature on delivery.[6] (*See* Romero Service Aff. ¶¶ 8–9, 11). These packages were signed for by two different receptionists. (*See id*. ¶¶ 10, 12). The affidavit also maintains Romero has been properly served under both Federal Rule of Civil Procedure 4(f)(2)(C)(ii) and Article 10(a) of the Hague Convention. (*See id*. ¶ 13). If there are no facts in dispute, the question of whether service of process was adequate is

---

[6] A copy of this Motion was included with each attempt, but the date of the hearing on the Motion was only included with the second. (*See* Romero Service Aff. ¶¶ 9, 11; Letter to Romero 1 [ECF No 36-5]).

Case No. 10-21982-CIV-ALTONAGA/Brown

purely a question of law which the Court must resolve. *See O.J. Distrib., Inc. v. Hornell Brewing Co., Inc.*, 340 F.3d 345, 354 (6th Cir. 2003) (citing *LSJ Inv. Co., Inc. v. O.L.D., Inc.*, 167 F.3d 320, 322 (6th Cir. 1999)).

Romero was not properly served under Federal Rule of Civil Procedure 4(f)(2)(C)(ii), which permits service "using any form of mail that the clerk addresses and sends to the individual . . . that requires a signed receipt." Here, Plaintiffs sent the documents directly without having the clerk address and send them as the Rule specifies. Moreover, Federal Rule of Civil Procedure 4(l)(2)(B) requires that service made by mail outside of the United States be proved "by a receipt signed by the addressee, or by other evidence satisfying the court that the summons and complaint were delivered to the addressee." In this case, the receipts were signed by receptionists at Romero's place of work, not by Romero himself. There is no other evidence in the record indicating Romero received the summons and complaint; therefore, Romero was not properly served under Rule 4(f)(2)(C)(ii).

Romero was also not properly served under the Hague Convention. Federal Rule of Civil Procedure 4(f)(1) permits service "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention." The United States and Spain are parties to the Hague Convention. *Carrascosa v. McGuire*, 520 F.3d 249, 259 n.24 (3rd Cir. 2008). Article 10(a) of the Hague Service Convention reads, "[p]rovided the State of Destination does not object, the present Convention shall not interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad." Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 10(a), *concluded* Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638. However, there is an unresolved

Case No. 10-21982-CIV-ALTONAGA/Brown

conflict among the circuit courts of appeal over whether "to send judicial documents" includes the initial service of process. This conflict arises because the Hague Convention repeatedly uses the terms "service," "purpose of service," and "effect service" in Articles 2 through 7, but the word "send" only in Article 10(a). The Fifth and Eighth Circuits have held that Article 10(a) does not permit initial service of process by postal channels. *See Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 384 (5th Cir. 2002) ("[B]ecause the drafters purposely elected to use forms of the word 'service' throughout the Hague Convention, while confining the use of the word 'send' to article 10(a), we will not presume that the drafters intended to give the same meaning to 'send' that they intended to give to 'service.'"); *Bankston v. Toyota Motor Corp.*, 889 F.2d 172, 174 (8th Cir. 1989) (agreeing that "[Article 10(a)] merely provides a method for sending subsequent documents after service of process has been obtained by means of the central authority."). The Second and Ninth Circuits have both ruled service by mail is allowed by the Hague Convention under Article 10(a). *See Brockmeyer v. May,* 383 F.3d 798, 802 (9th Cir. 2004); *Ackermann v. Levine*, 788 F.2d 830, 838–840, 839 (2nd Cir. 1986) (concluding the use of the word "send" in Article 10(a) "must be attributed to careless drafting" (quoting 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4-10 at 132 (1984))).

The Eleventh Circuit has not yet taken a position on the issue. However, district courts in Florida, while divided, have tended to follow the line of cases rejecting service by postal channels under Article 10(a). *See Arco Elec. Control, Ltd. v. Core Int'l*, 794 F. Supp. 1144, 1147 (S.D. Fla. 1992); *Wasden v. Yamaha Motor Co. in U.S.A.*, 131 F.R.D. 206 (M.D. Fla. 1990); *McClenon v. Nissan Motor Corp.*, 726 F. Supp. 822 (N.D. Fla. 1989). *But see Conax Florida Corp. v. Astrium*

Case No. 10-21982-CIV-ALTONAGA/Brown

*Ltd.*, 499 F. Supp. 2d 1287, 1293 (M.D. Fla. 2007); *Lestrade v. United States*, 945 F. Supp. 1557, 1559 (S.D. Fla. 1996). As noted in *Arco*, "[L]egislatures, including treaty conventions, act intentionally . . . . Where a legislative body uses particular language in one place but not in another, 'it is generally presumed that the body acts intentionally.'" 794 F. Supp. at 1147 (quoting *Bankston*, 889 F.2d at 174). Given the careful wordsmithing that underpins treaty drafting and the Hague Convention's repeated use of the specific term "service" throughout the treaty, had the drafters intended Article 10(a) to allow service by postal channels, they would have so stated. As drafted, Article 10(a) does not permit service by certified mail. Because Romero has not been properly served, a preliminary injunction cannot be issued against him.[7]

### D. Defendant Velasquez

The Court cannot exercise personal jurisdiction over Carlos Velasquez because he has not been served. *See Omni Capital*, 484 U.S. at 104. Accordingly, the Motion for Preliminary Injunction against Velasquez is denied.

### IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Preliminary Injunction **[ECF No. 8]** is **DENIED**.

---

[7] Moreover, if Romero has not been properly served, the notice requirement of Federal Rule of Civil Procedure 65(a)(1) will not have been satisfied. There is no evidence in the record that Romero has had actual notice of the Motion for Preliminary Injunction.

Case No. 10-21982-CIV-ALTONAGA/Brown

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of August, 2010.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record