UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 10-21982-CIV-ALTONAGA/Brown

INTELSAT CORPORATION; and
INTELSAT, LLC,

      Plaintiffs,

vs.

MULTIVISION TV LLC, *et al.*,

      Defendants.

_____/

## **ORDER**

**THIS CAUSE** comes before the Court upon Plaintiffs, Intelsat Corporation and Intelsat, LLC's (collectively, "Intelsat['s]") Motion for Entry of Default Final Judgment as to Defendant, Javier Eduardo Romero, and Renewed Motion for Entry of Default Judgment Against Multivision TV LLC (the "Motion") [ECF No. 76], filed on November 30, 2010. A Clerk's Default [ECF No. 46] was entered against Defendant, Multivision TV LLC ("Multivision"), on August 17, 2010, as Multivision failed to appear, answer, or otherwise plead, despite having been served. (*See* V. Return of Serv. [ECF No. 30-1]). A Clerk's Default [ECF No. 74] was entered against Defendant, Javier Eduardo Romero ("Romero"), on November 16, 2010, because he also failed to appear, answer, or otherwise plead, despite having been served. (*See* Aff. of Serv. [ECF Nos. 61, 61-1–3]). The Court has carefully considered the Motion, the record and the applicable law.

Case No. 10-21982-CIV-ALTONAGA/Brown

## I.  BACKGROUND

This case involves claims of breach of contract, unjust enrichment, conversion, and tortious interference with business relations.[1]  Although the case originally involved five defendants, two of them, World Wide Broadcast, Inc. ("World Wide") and Pablo Goldstein ("Goldstein"), settled (*see* Notice of Settlement [ECF No. 69]); and a third defendant, Carlos Velasquez ("Velasquez"), was dismissed after he was not timely served (*see* Order [ECF No. 66]).

On September 6, 2005, Intelsat and Defendant, Romero, purportedly acting on behalf of Multivision, entered into a Master Service Agreement ("Multivision MSA") for satellite communications services and thereafter entered into Service Contracts[2] addressing bandwidth and prices. (*See* 2d Am. Compl. ¶ 10; *see also* Multivision MSA [ECF No. 76-4]).  Under the terms of the Multivision MSA, Intelsat agreed to provide Multivision with certain telecommunications services in exchange for charges and fees, and Multivision agreed to pay all invoices issued by Intelsat for the services. (*See* 2d Am. Compl. ¶ 10).

Intelsat performed all of its obligations under the Multivision MSA. (*See id.*; Chernow Aff. ¶ 5 [ECF No. 8-2]).  As of November 30, 2009, the total cost of services provided by Intelsat pursuant to the Multivision MSA totaled $15,802,300.00. (*See* Nibecker Aff. ¶¶ 4, 6 [ECF No. 76-1]).  Despite being invoiced, Multivision did not pay. (*See id.* ¶ 4).  As a result, Intelsat terminated the Multivision MSA for non-payment. (*See* Chernow Aff. ¶ 7).  Under the terms of the Multivision

---

[1]  The Court dismissed Counts One and Seven of the First Amended Complaint against all of the Defendants. (*See* Order [ECF No. 57]).  Those counts alleged theft and conspiracy to steal satellite services under 47 U.S.C. § 605.

[2]  Despite their relevance to the calculation of damages for the breach of the Multivision MSA, these Service Orders have not been filed as part of the record.

Case No. 10-21982-CIV-ALTONAGA/Brown

MSA, all amounts due from Multivision to Intelsat under the remaining term of the Service Contracts became immediately due and payable. (*See id*.; *cf*. Multivision MSA 6).

On November 16, 2009, Intelsat and World Wide entered into a Master Service Agreement (the "World Wide MSA").  Under the terms of the World Wide MSA, Intelsat agreed to provide World Wide with certain satellite telecommunications services in exchange for charges and fees, and World Wide agreed to pay for those services.  (*See id*. ¶ 8).  Upon information and belief, Intelsat alleges World Wide resold the satellite services it leased from Intelsat to Multivision (the company Intelsat had just terminated for non-payment), and World Wide concealed from Intelsat that it intended to resell the satellite services to Multivision.  (*See* 2d Am. Compl. ¶ 17).

Intelsat performed all of its obligations under the World Wide MSA and the Service Contracts, and as of February 23, 2010, the cost of the services Intelsat had provided to World Wide under those agreements totaled $555,060.00.  (*See* Chernow Aff. ¶ 9).  Despite being invoiced, World Wide allegedly did not pay.  (*See id*. ¶ 10).  Consequently, on February 9, 2010, Intelsat terminated the World Wide MSA and all Service Contracts between itself and World Wide for non-payment.  (*See id*. ¶ 11).  Under the terms of the World Wide MSA, all amounts due from World Wide to Intelsat under the remaining term of the Service Contract became immediately due and payable.  (*See id.*).

In spite of the termination of the World Wide MSA and numerous demands, the Defendants[3] refused to cease transmission and continued to use and resell Intelsat's satellite and communication

---

[3] Plaintiffs allege it was Defendant Romero, acting as an agent of Multivision, and/or Defendants Goldstein and Carlos Velasquez, acting as agents of World Wide, who continued the transmission.

services without paying for them.  (*See* Johnson Aff. ¶ 5 [ECF No. 76-5]).  This prompted Intelsat

to attempt to jam Defendants' transmission, but Defendants responded by increasing power, which

resulted in interference with the transmissions of other Intelsat customers.  (*See id.* ¶ 7).  After this,

with significant effort and at considerable inconvenience to Intelsat and its customers, Intelsat moved

all other customers on the transponder utilized by the Defendants to other transponders.  (*See id.*).

Intelsat then muted the transponder being utilized by Defendants.  (*See id.*).  On April 26, 2010,

Defendants finally dropped their transmission to Intelsat's satellite.  (*See id.* ¶ 8).

The Second Amended Complaint contains five claims for relief, four of which are alleged

against Multivision and Romero.  Count One alleges a breach of the Multivision MSA, Count Three

alleges quantum meruit and unjust enrichment, Count Four alleges conversion, and Count Five

alleges tortious interference with business relations.  Intelsat seeks entry of a default final judgment

against both Multivision and Romero on each of these four counts.

## II.  DEFAULT JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 55(b)(2), a court is authorized to enter a final

judgment of default against a party who has failed to plead in response to a complaint.  "'[A]

defendant's default does not in itself warrant the court entering a default judgment.'"  *DirecTV, Inc.*

*v. Huynh*, 318 F. Supp. 2d 1122, 1127 (M.D. Ala. 2004) (quoting *Nishimatsu Constr. Co., Ltd. v.*

*Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  Granting a motion for default judgment

is within the trial court's discretion.  *See Nishimatsu*, 515 F.2d at 1206.  Because the defendant is

not held to admit facts that are not well pleaded or to admit conclusions of law, the court must first

determine whether there is a sufficient basis in the pleading for the judgment entered.  *See id.*; *see*

Case No. 10-21982-CIV-ALTONAGA/Brown

*also Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) ("[L]iability is well-pled in the

complaint, and is therefore established by the entry of default . . . ."). A default judgment cannot rest

on a complaint that fails to state a claim. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353,

1370 n.41 (11th Cir.1997) (citing *Nishimatsu*, 515 F.2d at 1206).

### III.  ANALYSIS OF LIABILITY

#### A.  Count One: Breach of Contract

To state a claim for breach of contract a plaintiff must allege: "(1) the existence of a contract;

(2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile*

*USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.,* 985 So. 2d

56, 58 (Fla. 4th DCA 2008)). Taking the allegations of the Second Amended Complaint as

admitted,[4] the Court finds Romero entered the Multivision MSA with Intelsat on behalf of

Multivision (*see* 2d Am. Compl. ¶ 10), and Multivision failed to pay the amount due under the terms

of the agreement (*see id.* ¶ 13). Intelsat has been damaged as a result of this failure to pay. (*See id.*

¶ 15). Therefore, Multivision is in breach of the Multivision MSA and liable to Intelsat for the

damages specified by that agreement.

Intelsat alleges that under the Multivision MSA, Multivision owes it a total of

$18,865,439.92 for the breach of contract; this number appears to include $15,802.300.00 in past due

payments plus a "Termination Fee," and $3,063,139.92 in interest. (*See* Niebecker Aff. ¶ 6).

---

[4] There are also a number of affidavits and documents in the record supporting the breach of contract claim. Intelsat has provided a copy of the Multivision MSA, which is signed by Romero. (*See* Multivision MSA). Intelsat has also provided affidavits corroborating Intelsat's allegations with respect to the Multivision MSA. (*See* Chernow Aff.; Niebecker Aff.).

Case No. 10-21982-CIV-ALTONAGA/Brown

However, the Court has reviewed the Multivision MSA and Intelsat's calculation of the damages due under that agreement, and cannot determine how Intelsat arrived at that number. The Multivision MSA provides that in the event of termination for cause, such as non-payment,

[Intelsat] may declare immediately due and payable a "Termination Fee" to be calculated as follows:

| Remaining Scheduled Service Term | Termination Fee |
|---|---|
| Up to 12 months | Total remaining Service Fees for what had been the scheduled Service Term |
| 13 months or more | (a) 12 months of Service Fees, plus (b) 50% of the remaining Service Fees in excess of 12 months for each month of what had been the scheduled Service Term. |

(Multivision MSA 6). Looking at the Multivision Account, it appears the monthly payments ranged from roughly $80,000.00 to $120,000.00 (*see* Multivision Account [ECF No. 76-1]), but there is nothing in the record showing how much time remained under the relevant Service Agreement. Under the Multivision MSA, both the monthly charge and number of months remaining are necessary to calculate the amount of damages due for the breach. Because the record does not permit the Court to determine the damage amount for the breach of the Multivision MSA, default judgment is denied without prejudice to allow Intelsat to file additional evidence to support the damage amount it has alleged.

The Second Amended Complaint also alleges Romero is personally liable for Multivision's breach of the Multivision MSA because "Multivision, a former Florida limited liability company, had been administratively dissolved . . . approximately eleven (11) months prior to Romero's

Case No. 10-21982-CIV-ALTONAGA/Brown

execution of the MSA on September 6, 2005." (2d Am. Compl. ¶ 11). Florida Statute section

608.4481(4) provides:

> A manager or member of a limited liability company dissolved pursuant to this
> section, purporting to act on behalf of the limited liability company, is personally
> liable for the debts, obligations, and liabilities of the limited liability company arising
> from such action and incurred subsequent to the limited liability company's
> administrative dissolution *only if* the manager or member has *actual notice* of the
> administrative dissolution at the time such action is taken . . . .

FLA. STAT. § 608.4481(4) (emphasis added). Romero is a managing member of Multivision (*see*

Art. of Org. 4 [ECF No. 76-2]; Corp. Reinstatement [ECF No. 76-3]), and he entered the Multivision

MSA on Multivision's behalf (*see* Multivision MSA 2). However, there is no allegation or evidence

in the record that Romero had actual notice Multivision had been dissolved at the time he signed the

Multivision MSA as a managing member. *Cf. Aboudraah v. Tartus Group, Inc.*, 795 So.2d 79, 82

(Fla. 5th DCA 2000) (setting aside a default judgment holding a director liable for a corporate note

because the complaint did not allege the defendant had acted on behalf of the corporation regarding

the note).

The Court has considered whether it can infer from the record that Romero had actual notice

of the dissolution of Multivision. The record contains a letter dated March 27, 2003 from Romero

("Romero Letter") [ECF No.76-3] which reads,

> Please be advised by this letter that we did not receive the renewal of the above
> mentioned company [Multivision]. Our lawyer informed us that the company is
> dissolved. We are enclosing a check for $100.00 for the two years renewal. Please
> update your records.

(*Id.*). Romero's Letter implies that Multivision was dissolved sometime before March 27, 2003, then

reinstated after the Florida Division of Corporations received Romero's letter and payment. Based

7

on the letter, Romero would have expected Multivision to remain active for at least two years —
through approximately March 2005 — which means when Romero signed the Multivision MSA in
August 2005, he would have expected that Multivision had been dissolved several months earlier.
As it turns out, Multivision was actually dissolved in October 2004 for failure to file an annual
report.  (*See* Sunbiz Rep. [ECF No. 8-2]).  This suggests Romero may have had notice that
Multivision had been dissolved.

      Nevertheless, there is a significant amount of information in the record indicating Romero
did not have actual notice Multivision had been dissolved.  First, the Romero Letter was Romero's
response to a prior dissolution of Multivision.  The existence of the letter suggests that if Romero
became aware Multivision had been dissolved again he would have acted to reinstate it; yet, the
record shows no corrective action taken after the October 2004 dissolution.  Second, after signing
the Multivision MSA, Multivision made at least 28 timely payments of $85,000.00–$121,800.00
between February of 2007 and February of 2009.  (*See* Multivision Account [ECF No 76-1]).  This
shows Romero treated Multivision as an active LLC not only for the purposes of entering the
Multivision MSA, but also for performing its obligations under the Agreement.  Although not
conclusive, the fact that Multivision abided by the agreement for more than three years tends to
suggest Romero did not have actual notice Multivision had been dissolved.  Therefore, Court cannot
infer Romero had actual notice Multivision had been dissolved when he signed the Multivision MSA
in August 2005.  Because section 408.4481(4) requires a managing member to have had actual notice
his company had been dissolved in order to be held personally liable for contracts entered after
dissolution, and because there is nothing in the record or pleadings demonstrating Romero had actual

Case No. 10-21982-CIV-ALTONAGA/Brown

notice Multivision had been dissolved in October 2004, Romero cannot, on the current record, be

held liable for Multivision's breach of the Multivision MSA. *Accord Aboudraah*, 795 So.2d at 82.

### B. Count Three: Unjust Enrichment

To state a claim for unjust enrichment a plaintiff must allege:

> (1) plaintiff has conferred [a] benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

*Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla.

3d DCA 1996) (quoting *Hillman Constr. Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. 4th DCA

1994)). The Second Amended Complaint alleges,

> In spite of the termination of the [World Wide] MSA and numerous demands, defendant Romero, acting as agent of defendant Multivision, . . . [has] refused to cease transmissions to Intelsat's satellite transponder, and [has] continued to illegally pirate Intelsat LLC's satellite and communication services without paying for them, and [has] continued to resell such satellite and communication services to customers for the benefit of Defendants.

(2d Am. Compl. ¶ 22). Intelsat specifically alleges Multivision and Romero were aware of the

indirect commercial advantage or private financial gain the Defendants acquired by continuing their

satellite transmissions without paying for them, and that Multivision and Romero retained those

benefits. (*See id*. ¶¶ 39–41).

Taking these allegations as true, Multivision and Romero were unjustly enriched through

their unauthorized use of Intelsat's satellite. Based on the affidavit of Thomas Johnson, there were

a total of 76 days of unauthorized transmissions to the satellite. (*See* Johnson Aff. ¶¶ 4, 8). Pursuant

to the World Wide MSA, the monthly charge for the use of the satellite was $46,255.00. (*See*

9

Case No. 10-21982-CIV-ALTONAGA/Brown

Niebecker Aff. ¶ 7).  Seventy-six days of unauthorized use at monthly charge of $46,255.00 equals a total charge of $117,179.33.  (*See id.*).

### C.  Count Four:  Conversion

In Florida, to state a claim for conversion, a plaintiff must allege an "(1) act of dominion wrongfully asserted; (2) over another's property; . . . (3) inconsistent with his ownership therein." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1294 (S.D. Fla. 2001) (citing *Warshall v. Price*, 629 So. 2d 903, 904 (Fla. 4th DCA 1993)).  The essence of the tort is "the wrongful deprivation of the property of the owner and neither manucaption nor asportation is an essential element thereof."  *Gen. Fin. Corp. of Jacksonville, Inc. v. Sexton*, 155 So. 2d 159, 161 (Fla. 1st DCA 1963).  The deprivation may be permanent or for an indefinite period of time.  *See Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1160–61 (Fla. 3d DCA 1984) (citing *Star Fruit Co. v. Eagle Lake Growers*, 33 So. 2d 858, 860 (Fla. 1948)).

The Second Amended Complaint alleges "Defendants Multivision, . . . [and] Romero . . . have continued to pirate Intelsat LLC's satellite capacity by illegally sending telecommunications signals to and receiving telecommunication signals from Intelsat LLC's satellite transponders.  Such actions constitute theft of services, . . . [and] conversion of Intelsat's property."  (2d Am. Compl. ¶ 23).  While this allegation is a legal conclusion, the Second Amended Complaint contains other factual allegations indicating that Defendants' unauthorized transmissions prevented Intelsat from using the satellite transponder for any purpose.  (*See id*. ¶ 26).  The allegations of Romero and Multivision's unauthorized transmissions to the satellite and the concomitant disruption of service are acts of dominion over Intelsat's satellite services inconsistent with Intelsat's ownership.  Taking

10

the allegations in the Second Amended Complaint as true, Multivision and Romero are liable for conversion of Intelsat's satellite communication services.[5]

"[T]he owner of property which has been converted is entitled to fair value at the time and place of the conversion, with interest." *Christopher Adver. Grp., Inc. v. R & B Holding Co., Inc.*, 883 So.2d 867, 871 (Fla. 3d DCA 2004) (citing Restatement (Second) of Torts § 927 (1979)).  For most goods, fair value is the market value.  *See id.*  In this case, the World Wide MSA's monthly charge of $46,255.76 indicates a fair market price for the bandwidth converted by Defendants.  Therefore, the damages for conversion come to the same amount as those for unjust enrichment — $117,179.33.

### D.  Count Five: Tortious Interference with Business Relations

The elements of tortious interference with a business relationship are: "(1) the existence of a business relationship . . . ; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Palm Beach Co. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).  Plaintiffs allege Defendants, including Multivision and Romero, were aware illegally accessing bandwidth would prevent Intelsat from leasing that bandwidth to other customers and were aware the unauthorized transmission would disrupt the transmissions of other customers.  (*See* 2d Am. Compl. ¶¶ 48–49).  Furthermore, Defendants attempted to override

---

[5]  The risk that the Defendants will resume the unauthorized transmission means the deprivation of property is "indefinite" as required to show conversion, rather than trespass.

Case No. 10-21982-CIV-ALTONAGA/Brown

Intelsat's efforts to jam the transmission and to shut down the transponder by increasing the power of the unauthorized transmission.  (*See* 2d Am. Compl. ¶¶ 24–25).

Based on these allegations which have been admitted by default, it is reasonable to infer Multivision and Romero intended to interfere with Intelsat's ongoing relationships with other customers.  Consequently, Multivision and Romero are liable for tortious interference.  However, Intelsat does not provide a specific damage amount for the tortious interference count.  Instead, Intelsat seems to imply the damages are the same for the tortious interference claim as for the unjust enrichment and conversion claims.  (*See* Mot. 5).  This cannot be the correct measure of damages. In a tortious interference case, "[i]f the business is not completely destroyed, then it may recover lost profits."  *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 F. App'x 591, 601 (11th Cir. 2006) (citing *Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So.2d 180, 193 (Fla. 2d DCA 2004) (citations omitted)).  In order for the Court to determine the amount of damages caused by Defendants' tortious interference, Intelsat must provide specific evidence of lost profits due to inference with specific business relationships caused by Defendants' unauthorized transmissions.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.      The Motion for Default Judgment **[ECF No. 76]** is **GRANTED in part** and **DENIED in part**.

2.      The Motion is **GRANTED** with respect to Multivision TV LLC and Javier Eduardo Romero on Count Three and Count Four.

12

3.      The Motion is **DENIED** without prejudice with respect to Multivision TV LLC and Javier Eduardo Romero on Count One and Count Five.

4.      Judgment is entered against Multivision and Romero jointly and severally on Counts Three and Four in the amount of $117,179.33.  These two counts are alternative bases for recovery, and therefore Intelsat may only recover a combined total of $117,179.33 under these two counts.

5.      On or before January 14, 2011, Intelsat may file a Second Motion for Default Judgment against Multivision and Romero on Counts One and Five to address whether Romero had actual notice Multivision had been dissolved when he signed the Multivision MSA.  The motion should also explain and provide legal authority for the measure of damages for Counts One and Five, and describe in detail, with reference to the record, how Intelsat calculates the damage amounts it requests. Failure to file a motion by this deadline will result in the entry of an order dismissing these remaining counts and closing the case.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of December, 2010.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

13